UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| THOMAS PARISI, on behalf of himself and all others similarly situated,<br><br>     Plaintiff,<br><br>  vs.<br><br>AMERICAN AIRLINES, INC., THE EMPLOYEE BENEFITS COMMITTEE AND JOHN/JANE DOES 1-5,<br><br>     Defendants. | No.<br><br>**CLASS ACTION COMPLAINT** |

Plaintiff, Thomas Parisi, a former employee of American Airlines, Inc. ("American Airlines"), brings this class action for violations of the Employee Retirement Income Security Act of 1974 ("ERISA").

## INTRODUCTION

1.      This is a class action against American Airlines, the Employee Benefits Committee ("Committee"), and the Committee's individual members (collectively, "Defendants") concerning the failure to pay joint and survivor benefits under four American Airlines pension plans (the "Plans") in amounts that satisfy ERISA §205's actuarial equivalence requirements.[1]

2.      American Airlines sponsors the Plans.  Each of the Plans is a defined benefit pension plan which uses an accrual formula based on the participant's job category, when the participant began participating in the Plans and which American Airlines subsidiary the participant worked for.

3.      Under the Plans, American Airlines retirees earn pension benefits in the form of a single life annuity ("SLA"). An SLA provides participants with monthly payments for the rest of their lives when they retire.

4.      The Plans also offer retirees several forms of qualified joint and survivor annuities ("QJSAs"). A QJSA is an annuity for the participant's life with a contingent annuity payable to the participant's spouse for the rest of the spouse's life.  A QJSA is expressed as a percentage of

---

[1]  The Plans are (a) the Retirement Benefit Plan of American Airlines, Inc. for Employees Represented by the Transport Workers Union of America, AFL-CIO (the "TWU Plan"), (b) the Retirement Benefit Plan of American Airlines, Inc. for Agent, Management, Specialist, Support Personnel and Officers (the "Management Plan"), (c) The Retirement Benefit Plan of American Airlines, Inc. for Flight Attendants (the "Flight Attendants' Plan"); and (d) American Airlines, Inc. Pilot Retirement Benefit Program (the "Pilots Plan").

the amount paid during the participant's life to the surviving spouse after the participant's death. The Plans offer 50%, 66 $^2/_3$%, 75%, and 100% QJSAs. .

5.      The monthly benefit payable as a QJSA, regardless of the percentage, will be less than the amount payable as an SLA because the QJSA accounts for the likelihood that the Plans will have to pay benefits for a longer period if a participant dies before the spouse.  ERISA limits the extent to which a plan can reduce QJSA benefits below a participant's SLA benefits. Under ERISA § 205(d), 29 U.S.C. § 1105(d), QJSAs with survivorship percentages between 50% and 100% must be at least the actuarial equivalent of the participant's SLA.  Two benefit options are actuarially equivalent when they have the same present values, calculated using the same, reasonable actuarial assumptions.

6.      Calculating present value requires inputting actuarial assumptions concerning projected mortality and interest rates.

7.      Mortality tables for the participant and the participant's beneficiary predict how long participants and beneficiaries will live to account for the likelihood of each future benefit payment being made.  Over the last several decades, mortality rates have generally improved with advances in medicine and better collective lifestyle habits.  People who retired recently are expected to live longer than those who retired in previous generations.  Older mortality tables predict that people near (and after) retirement age will die at a faster rate than current mortality tables.  Using an older mortality table decreases the present value of a QJSA and — interest rates being equal — the monthly payments retirees receive. Consequently, to determine "present" rather than "past" value, the mortality table must be based on the projected mortality of the participants when they retire, not the mortality of people who died decades ago. Only current mortality tables can be reasonable.

8.    The interest rate assumption accounts for the time value of money — the idea that a dollar in hand today is worth more than a dollar paid in a year, or in ten years — and discounts the value of expected future benefit payments to the present.  Because the present value of benefits is determined on the date benefits commence, interest rates that are current on that date are required. Like mortality, the interest rate affects the calculation.  Using lower interest rates — mortality rates being equal — decreases the present value of QJSA benefits. Only current interest rates can be reasonable.

9.    To determine the amount of a benefit, mortality and interest rate assumptions, ***together***, generate a "conversion factor," which is expressed as a percentage of the benefits being compared.  Accordingly, the actuarial assumptions used to generate the conversion factor directly impact the benefit amount that participants and their beneficiaries receive each month.

10.    A conversion factor can also be calculated by dividing the actual amounts payable under the plan.  For example, if a QJSA benefit pays $900 a month and the SLA pays $1,000 a month, the conversion factor would be .90.  If the conversion factor is lower than the one generated using reasonable mortality and interest rate assumptions, the QJSA is not "actuarially equivalent" to the SLA.  Accordingly, the conversion factor and the actuarial assumptions used to generate it determine whether two benefit forms are actuarially equivalent.

11.    Each of the Plans uses the same actuarial assumptions to calculate QJSAs: the Unisex Pension 1984 mortality table ("UP-84"), which is based on mortality data that is ***more than 50 years old***,  when people had shorter life expectancies, and a 5 percent interest rate.[2] American's use of the UP-84 mortality table is unreasonable because it consists of outdated mortality rates that

---

[2] The Pilots Plan also has another part that uses an even older mortality table: the a-49 Mortality Table for males only.

are significantly higher than the rates in current tables and it does not match the mortality experience of any of the Plans.

12. By using flawed formulas to calculate QJSA benefits — based on antiquated, unreasonable actuarial assumptions — Defendants depress the value of QJSAs, resulting in monthly payments that are *materially lower* than they would be if Defendants used conversion factors based on up-to-date, reasonable actuarial assumptions. In sum, Defendants are causing Plaintiff and Class Members to receive less than they should in pension benefits each month, which will continue to affect them throughout their retirements.

13. Accordingly, Plaintiff seeks an order from the Court (1) declaring that the actuarial assumptions and conversion factors used to determine QJSA benefits under the Plans produce benefits that are less than the actuarial equivalent of the SLAs offered to participants; (2) requiring Defendants to recalculate Plaintiff's and the Class's QJSA benefits in a manner consistent with ERISA's actuarial equivalence requirements; (3) requiring Defendants to pay all amounts improperly withheld in the past; (4) requiring Defendants to increase the amounts of Plaintiff's and the Class's future benefit payments; and (5) for such other relief as the Court determines to be just and equitable.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

15. This Court has personal jurisdiction over the each of the Defendants because they transact business in, or resides in, and has significant contacts with, this District, and/or because ERISA provides for nationwide service of process.

16. American Airlines has a substantial presence in Illinois, operating one of its worldwide "hubs" in Chicago at O'Hare International Airport.[3] Over the last three months, on average, over 300 American flights have departed from O'Hare per day. Over the time period relevant to this lawsuit, American Airlines has maintained a consistent and significant presence in Illinois. Moreover, a large number of American Airlines employees work in and live in Illinois, and this suit arises out of American Airlines' contacts with its employees, which substantially occurred in this District.

17. The Employee Benefit Committee and its members have substantial contacts with this District. The Committee oversees benefits for American Airlines' employees, including those who are citizens of Illinois. This suit arises out of the Committee's contacts with those employees, which substantially occurred in this District.

18. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because a substantial portion of the violations of ERISA occurred in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants maintain a consistent and substantial presence in this District and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

### I. Plaintiff

19. Plaintiff Thomas Parisi is a citizen and resident of Elk Grove Village, Illinois, and a participant in the TWU Plan. Parisi worked at O'Hare airport. Plaintiff Parisi selected a 50% QJSA with his wife as the beneficiary. He started receiving benefits on May 1, 2021.

---

[3] American Airlines' Form 10-K for year-ending December 31, 2023 at 45 (Listing Chicago as one of its "hubs," and stating "Substantially all of our flights either originate at or depart from these locations."); *see also id*. at 44 (discussing the "significant amount of capital spending…at a number of airports where we have significant operations, such as O'Hare …") .

**II.    Defendants**

20.    American Airlines, Inc. is a Delaware Corporation with its headquarters in Fort Worth, Texas. American sponsors the Plans. American is the Plan administrator of the Plans.

21.    Defendant Employee Benefits Committee is an unincorporated association with a principal place of business in Fort Worth, Texas.  According to the Plans' financial statements, the "Committee was formed for the purpose of having responsibility for all fiduciary duties related to the administration and investment of the Plan[s]. Five members were appointed, all of whom are officers employed by American."

22.    John/Jane Does 1 through 5, inclusive, are the individual members of the Committee, or any other committee(s) responsible for administering the Plans.  Their names and identities are not currently known.

**APPLICABLE ERISA REQUIREMENTS**

**I.    Pension Benefit Options Must Be Actuarially Equivalent**

23.    ERISA requires that defined benefit plans must pay married participants their pension benefits as a QJSA unless the participant and his or her spouse consent to another payment form. A QJSA must be the default benefit for employees who are married.  ERISA §§ 205(a), 29 U.S.C. § 1055(a).

24.    ERISA defines a QJSA as an annuity "for the life of the participant" with a survivor benefit for the life of the spouse that is not less than 50%, and not greater than 100% of the annuity payable "during the joint lives of the participant and the spouse."  ERISA § 205(d)(1), 29 U.S.C. § 1055(d)(1).  A QJSA includes "any annuity in a form having the effect of an annuity" described in ERISA § 205(d)(1).  *Id.*  Accordingly, a plan can offer multiple QJSA options; that is, QJSAs that pay survivor benefits between 50% to 100%. *Id.*  But one QJSA must be designated as the

6

default option for married participants. A QJSA must be actuarially equivalent to the SLA, "a single annuity for the life of the participant," that participants accrue under their plan. *Id.*

25.     Pension plans must offer participants one particular form of OJSA, known as a qualified optional survivor annuity ("QOSA.") *See* ERISA § 205(d)(2), 29 U.S.C. § 1055(d)(2). A QOSA's survivor annuity percentage must be: (a) greater than 75% if the designated QJSA's survivor annuity percentage is less than 75%; and (b) 50% if the designated QJSA's survivor annuity percentage is greater than 75%. The definition of a QOSA includes "any annuity in a form having the effect of an annuity" described in ERISA § 205(d)(2). ERISA requires that QOSAs be actuarially equivalent to an SLA. *See* ERISA § 205(d)(2)(A)(ii), 29 U.S.C. § 1055(d)(2)(A)(ii).

26.     Reorganization Plan No. 4 of 1978 transferred authority to the Secretary of the Treasury to issue regulations for several provisions of ERISA, including § 205, which concerns alternative forms of benefits. *See* 92 Stat. 3790 (Oct. 17, 1978), codified at 29 U.S.C. § 1001.

27.     The Treasury regulations for the Internal Revenue Code (the "Tax Code") provision corresponding to ERISA § 205 (26 U.S.C. § 401(a)(11)) provide that a QJSA "must be at least the actuarial equivalent of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan." 26 C.F.R. § 1.401(a)-11(b)(2). Indeed, a QJSA "must be as least as valuable as any other optional form of benefit under the plan at the same time." 26 C.F.R. § 1.401(a)-20 Q&A 16. Accordingly, if a plan offers other benefit options that are more valuable than the SLA, the QJSA must be at least as valuable as the most valuable form of those benefit options. The regulations regarding QJSAs apply "when the participant attains the earliest retirement age under the plan." 26 C.F.R. § 1.401(a)-20 Q&A 17.

28.     ERISA does not require pension plans to offer lump sum benefit distributions to retirees. But if plans offer lump sums, ERISA § 205(g)(3), 29 U.S.C. § 1055(g)(3), requires that

the present value of the lump sum be at least equal to the present value of the participant's benefits determined using the applicable mortality table (the "Treasury Mortality Table")[4] and the applicable interest rate (the "Treasury Interest Rate")[5] (collectively, the "Treasury Assumptions"). The Treasury Assumptions are set by the Secretary of the Treasury (the "Secretary") pursuant to IRC §§ 417(e) and 430(h) and are based on current market interest rates and mortality assumptions. *See* 29 U.S.C. § 1055(g)(3)(B); 29 U.S.C. § 1083(h), 26 U.S.C. §§ 417(e) and 430(h).

## II.     Reasonable Factors Must Be Used When Calculating Actuarial Equivalence

29.     "Two modes of payment are actuarially equivalent when their present values are equal under a given set of assumptions."  *Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (citing Jeff L. Schwartzmann & Ralph Garfield, Education and Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1-24-91 (1991) ("Schwartzmann & Garfield").[6]

30.     Under ERISA, "present value" must "reflect anticipated events."  Present value adjustments "shall conform to such regulations as the Secretary of the Treasury may prescribe." ERISA § 3(27), 29 U.S.C. § 1002(27). The Secretary has prescribed several Regulations describing how present value should reasonably reflect anticipated events, including:

a.     The Regulation concerning QJSAs provides that "[e]quivalence may be determined, on the basis of consistently applied ***reasonable actuarial factors***, for each participant or for all participants or reasonable groupings of participants." 26 C.F.R. § 401(a)-11(b)(2) (emphasis added).

---

[4] *See* 26 C.F.R. § 1.430(h)(2)-1.

[5] *See* 26 C.F.R. § 1.430(h)(3)-1.

[6] According to Merriam Webster: "Equivalent" means "equal." *See* https://www.merriam-webster.com/dictionary/equivalent.  "Equal" means the "same." https://www.merriam-webster.com/dictionary/equal

b.     A plan must determine optional benefits using "a single set of *interest and mortality assumptions that are reasonable* . . . ." 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) (emphasis added).

c.     The term actuarial present value means "actuarial present value (within the meaning of § 1.401(a)(4)-12) determined using *reasonable actuarial assumptions*." 26 C.F.R. § 1.411(d)-3(g)(1) (emphasis added).

d.     With respect to benefits under a lump sum-based formula, any optional form of benefit must be "at least the actuarial equivalent, using *reasonable actuarial assumptions* . . . ." 26 C.F.R. § 1.411(a)(13)-1(b)(3) (emphasis added).

31.     Moreover, under ERISA section 205, the present value assumptions for the SLA should reasonably reflect the "life of the participant," and the present value assumptions for the QJSA should reasonably reflect the "joint lives of the participant and the spouse."  29 U.S.C. § 1055(d)(1). They should not reflect the lives of participants who lived decades ago.

32.     The Regulations rely on the standards of the Society of Actuaries (the "SOA") for determining the present value of pension liabilities. *See, e.g.,* 26 C.F.R. § 1.430(h)(3)-1(a)(2)(C); IRS Notices: 2008-85, 2013-49, 2015-53, 2016-50, 2018-02; 82 Fed. Reg. 46388-01 (Oct. 5, 2017) ("Mortality Tables for Determining Present Value Under Defined Benefit Plans"), 72 Fed. Reg. 4955-02 (Feb. 2, 2007) ("Updated Mortality Tables for Determining Current Liability").

33.     Like the Regulations and ERISA's definitions of "present value," the Actuarial Standards of Practice ("ASOPs") issued by the Actuarial Standards Board ("ASB")[7] of the

---

[7] The ASB is an independent entity created by the Academy in 1988. It has the sole authority to develop, obtain comment upon, revise, and adopt standards of practice for the entire actuarial

American Academy of Actuaries (the "Academy"), require actuaries to use "reasonable assumptions." *See* ASOP No. 27, § 3.6 ("each economic assumption used by an actuary should be reasonable"); *see also* ASOP No. 35, § 3.3.5 ("Each demographic assumption selected by the actuary should be reasonable").

34.     Courts interpreting ERISA's actuarial equivalence requirements when calculating benefits have stated that "**special attention must be paid to the actuarial assumptions underlying the computations**." *Pizza Pro Equip. Leasing v. Comm. of Revenue*, 147 T.C. 394, 411 (emphasis added), *aff'd*, 719 F. App'x 540 (8th Cir. 2018).  As the Ninth Circuit stated in *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1110 (9th Cir. 2000):

> The most important consideration in preparing and selecting a mortality table to be used in calculating pension benefits is whether the population from whom the mortality experience is developed is sufficiently broad and has characteristics that are typical of the plan's participants.

35.     The court explained in *Dooley v. Am. Airlines, Inc.* that each assumption used in an actuarial equivalence determination must be reasonable:

> When the terms of a plan subject to ERISA provide that plan participants may opt to receive their accrued pension benefits in forms other than as a single life annuity, the amount payable to the plan participant under such circumstances must be "actuarially equivalent" to the participant's accrued benefits when calculated as a single life annuity.  The term actuarially equivalent means equal in value to the present value of normal retirement benefits, ***determined on the basis of actuarial assumptions with respect to mortality and interest which are reasonable in the aggregate***.

*Dooley v. Am. Airlines, Inc.*, 1993 WL 460849, at * 10 (N.D. Ill. Nov. 4, 1993) (emphasis added); *see also Dooley v. Am. Airlines, Inc.*, 797 F.2d 1447, 1453 (7th Cir. 1986) (citing expert testimony that "actuarial equivalence must be determined on the basis of reasonable actuarial assumptions.").

---

profession in the United States. The ASOPs set forth the standards that actuaries follow in performing actuarial services, including determining the actuarial equivalence and present value of a stream of benefit payments.

36.    Actuarial equivalence should be "cost-neutral," meaning that neither the plan nor participants should be better or worse off if participants select an SLA or a QJSA.  *See Bird v. Eastman Kodak Co.*, 390 F.Supp.2d 1117, 1118–19 (M.D. Fla. 2005).

37.    "Periodically, the assumptions used [for actuarial equivalence] must be reviewed and modified so as to insure that they continue to fairly assess the cost of the optional basis of payment."  Schwartzmann & Garfield at 11; *see also Smith v. Rockwell Automation*, No. 19-CV-0505, 2020 WL 620221, * 7 (E.D. Wisc. Jan. 10, 2020) ("plans must use the kind of actuarial assumptions that a reasonable actuary would use at the time of the benefit determination.").

**SUBSTANTIVE ALLEGATIONS**

**I.      The Plans**

38.    American Airlines established the Plans to "provide retirement income for eligible employees and their beneficiaries." *See, e.g*., Flight Attendants' Plan at Preamble; TWU Plan at Preamble; Management Plan at Preamble.  American Airlines sponsors each of the Plans.

39.    Each of the Plans is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

40.    Each of the Plans is a "defined benefit plan" within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

41.    Each of the Plans is administered by American Airlines and the Committee.  The Committee is comprised of five members, all of whom are officers of American Airlines.

42.    The Plans define the term "Administrator" to mean American Airlines. *See* Flight Attendants' Plan §§ 2.6, 2.19; TWU Plan §§ 2.6, 2.19; Management Plan §§ 2.6, 2.19.

43.    The Plans state that American Airlines "shall be a 'named fiduciary' with the responsibility and authority to control the operation and administration of the Plan except to the

11

extent such responsibility and authority has specifically been assigned . . . ." *See* Flight Attendants' Plan § 11.1; TWU Plan § 11.1; Management Plan § 10.1.

44.     The Plans' Forms 5500 state that "[t]he Employee Benefits Committee was formed for the purpose of having responsibility for all fiduciary duties related to the administration and investment of the Plan."

45.     Under the Plans, participants earn a monthly pension payable as an SLA. Participants' monthly pensions are based on a percentage of their compensation during their final five (5) years of service and how many years they worked for American Airlines.  The amount of their monthly pensions payable as an SLA are then adjusted based on how old they are when they start receiving benefits.

46.     The Plans offer 50%, 66 $^2/_3$%, 75%, and 100% QJSAs to retiring participants.  The 50% form is the default option for married participants and the 75% form is the designated QOSA. The Plans provide that each QJSA must be actuarially equivalent to the participant's SLA as of when the participant starts receiving benefits.  *E.g.* Flight Attendants' Plan at §§ 9.2(a), 9.4(a) and 9.4(b)(i), (vi); TWU Plan at §§ 9.2(a), 9.4(a) and 9.4(b)(i), (v); Management Plan §§ 8.2(a), 8.4(a), 8.4(b)(i), (v).

## II.     The Plans' QJSA Do Not Satisfy ERISA's Actuarial Equivalence Requirements

### A.  Actuarial Assumptions Used to Determine Actuarial Equivalence Must Be Reasonable as of the Date Benefits Are Calculated

47.     To compare the present values of two benefit options offered to a plan participant at the time she begins collecting benefits, it is necessary to determine the present values of the *aggregate* (*i.e.,* total) future benefits the participant (and, if applicable, the beneficiary) is expected to receive under each form using actuarial assumptions that are reasonable as of that date. There

are two main components of these present value calculations: (1) an interest rate and (2) the mortality table applied to participants and beneficiaries.

48.     An interest rate is used to determine the present value of each future payment. This is based on the time value of money, meaning that money available now is worth more than the same amount in the future due to the ability to earn returns. The rate is often called a "discount rate" because it discounts the value of a future payment. *Berger v. Xerox Corp. Retirement Income Guar. Plans*, 338 F.3d 755, 759 (7th Cir. 2003). ("A discount rate is simply an interest rate used to shrink a future value to its present equivalent.").

49.     The interest rate used by a defined benefit plan to calculate present value must be based on prevailing market conditions, which are reasonable because they "reflect anticipated events" and the lives of the participants and spouses. ERISA § 3(27), 29 U.S.C. § 1002 (27); ERISA § 205 (d); 29 U.S.C. § 1055 (d). The interest rate may be broken into segments of short-term, medium-term and long-term expectations pertaining to each future payment. *See, e.g.*, ERISA §§ 205(g)(3)(B)(iii) and 303(h)(2), 29 U.S.C. §§ 1055(g)(3)(B)(iii) and 1083(h)(2).

50.     As alleged above, under § 3.6 of ASOP No. 27,[8] the standards of professional actuaries require that "each economic assumption used by an actuary should be reasonable."[9] An assumption is deemed "reasonable" if it "takes into account historical and current economic data that is relevant as of the measurement date," and "reflects the actuary's estimate of future experience." *See* ASOP No. 27, § 3.6 (emphasis in original).

---

[8] Courts look to professional actuarial standards as part of this analysis. *See, e.g.*, *Stephens*, 644 F.3d at 440 (citing Schwartzmann & Garfield); *see also McDaniel*, 203 F.3d at 1110 (citing American Academy of Actuaries' publication).

[9] Available at: https://www.actuarialstandardsboard.org/asops/selection-economic-assumptions-measuring-pension-obligations/

51.     The Treasury Interest Rates use the current yields of corporate bonds and are updated monthly to reflect current economic conditions. The Treasury Interest Rates are reasonable.

52.     A mortality table is a series of rates which predict how many people at a given age will die before attaining the next higher age.

53.     More recent mortality tables are "two-dimensional" in that the rates are based not only on the age of the individual but the year of birth.

54.     The SOA, an independent actuarial group, publishes the mortality tables that are the most widely used by defined benefit plans when doing these calculations. The SOA published mortality tables in 1971 (the "1971 GAM"), 1976 (the UP 1984), 1983 (the "1983 GAM"), 1994 (the "1994 GAR"), 2000 (the "RP-2000"), 2014 ("RP-2014"), and 2019 (the "Pri-2012") to account for changes to the population's mortality experience.

55.     Since at least the 1980s, the life expectancies in mortality tables have been on an upward trend as shown below:



Source: Aon Hewitt, *Society of Actuaries Finalizes New Mortality Assumptions: The Financial and Strategic Implication for Pension Plan Sponsors* (November 2014), at 1. According to this

14

paper, there have been "increasing life expectancies over time" and just moving from the RP-2000 mortality table to the 2014 table would substantially increase projected morality and, therefore, increase pension liabilities by 7%.

56.     The SOA published the Pri-2012 mortality table in 2019.  The mortality rates in the Pri-2012 are consistent with those in the RP-2014 table.

57.     Under § 3.5.3 of ASOP 35, professional actuarial standards of practice require that mortality tables must be adjusted on an ongoing basis to reflect improvements in mortality.[10]

58.     In the years between the publication of a new mortality table, mortality rates are "projected" to future years to account for expected improvements in mortality.[11]  In 2017, the Treasury Mortality Table was the RP-2000 mortality table adjusted for mortality improvement using Projection Scale AA to reflect the impact of expected improvements in mortality since publication of the table. IRS Notice 2016-50.[12]  In 2018, the Treasury Mortality Table was the RP-2014 mortality table projected to account for additional improvement in mortality rates that have occurred since 2014. IRS Notice 2017-60.[13]  The Treasury Mortality Table is now the Pri-2012.

59.     For purposes of the present value analysis under ERISA, the mortality table must be updated and reasonable "to reflect anticipated events" and the lives of the participants and spouses. ERISA § 3(27), 29 U.S.C. § 1002 (27); ERISA § 205 (d); 29 U.S.C. § 1055 (d), not the lives of those who lived decades ago.

---

[10] *See* http://www.actuarialstandardsboard.org/asops/selection-of-demographic-and-other-noneconomic-assumptions-for-measuring-pension-obligations/#353-mortality-and-mortality-improvement

[11] Life expectancies with a projection scale assume a generational projection of future mortality improvements (i.e., life expectancies increase with year of birth).

[12]  *See* https://www.irs.gov/pub/irs-drop/n-16-50.pdf.

[13] *See* https://www.irs.gov/pub/irs-drop/n-17-60.pdf.

60. The Treasury Mortality Tables are updated to reflect recent mortality data from participants in private pension plans. *See* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv). The Treasury Assumptions are reasonable.

61. Using a reasonable interest rate and mortality table, the present values of an SLA and another benefit form can be compared to determine if they are actuarially equivalent. Pension plans must use reasonable, current interest rates and mortality tables to evaluate whether the present values of benefit options produce actuarially equivalent benefits for participants and beneficiaries.

## B. The Plans' Assumptions Do Not Produce Actuarially Equivalent Survivor Annuity Benefits in Violation of ERISA.

62. The Plans define the term "Actuarial Equivalence" as "equality in value of the aggregate amounts expected to be received as a benefit from the Plan under different forms of payment based upon actuarial factors and assumptions." Flight Attendants' Plan at § 2.3; TWU Plan at § 2.3; Management Plan § 2.3.

63. Throughout the Class Period, each of the Plans used a 5 percent interest rate and the UP-84 mortality table weighted eighty-eight percent (88%) male and twelve percent (12%) female to calculate the present values of QJSAs and SLAs. *Id.*[14]

64. These assumptions do ***not*** produce QJSAs that are actuarially equivalent to the SLAs offered to participants because the present values of the QJSAs are lower than the present values of the SLAs.

65. The UP-84 table is not a reasonable mortality assumption because the table is outdated and does not "reflect anticipated events" or the lives of participants and spouses. (i.e., the

---

[14] The Pilots Plan also includes a Variable Retirement Annuity that uses a 6 percent interest rate and the "a-49" Mortality Table for males only.

anticipated mortality rates of participants). The UP-84 was published in 1976 and is ***based on experience data from the 1960s*** that do not incorporate improvements in mortality that have occurred since that time.

66.     For example, a 65-year-old male is expected to live only an additional 15.4 years (i.e., until age 80.4) under the UP-84 but an additional 21.6 years (i.e., until age 81.6) under the RP-2014. Thus, the average employee expects to receive, and the average employer expects to pay, benefits for a substantially longer period given the mortality improvements that have occurred since the UP-84 was published.

67.     The UP-84 overstates mortality rates, producing lower conversion factors than those using a reasonable mortality assumption.

68.     While males have higher mortality rates than females, the disparity has narrowed considerably over the last 40 years.  The UP-84 table is based on mortality data that is 80% male. But, the Plans use of a version of the UP-84 that is 88% male/12% female. While the 12% female ratio used by the Plans does not represent the demographics of any of the Plans, and American's additional modification to the UP-84 to use an even higher percentage of males further reduces the conversion factor when calculating QJSAs.

69.     The UP-84 table and the 5% interest rate used by the Plans generated lower conversion factors than those generated by reasonable mortality and interest rates during the Class Period.

70.     The Plans' assumptions used to calculate QJSAs have not changed in many years. These assumptions produce benefits that are not actuarially equivalent to participants' SLA benefits.  This is true for each participant that selects a QJSA under the Plans, regardless of the participant's age or when benefits commenced.

17

**III.    The Plans' formula for calculating QJSAs caused Plaintiff and the Class to not receive the actuarial equivalent of the SLA offered.**

71.    Plaintiff's and the Class's benefits are ***substantially lower*** (i.e., worse for participants) than those generated using reasonable actuarial assumptions such as the applicable Treasury Assumptions.

72.    While the amount of the loss suffered will vary depending on the ages of the participant and beneficiary at the time of retirement, and on the percentage of the survivor annuity, all participants receiving QJSAs under the Plans are not receiving actuarially equivalent forms of benefit because the present values of those benefits are not equal to the present values of the SLAs they could have taken at the times they retired.

73.    By applying unreasonable, antiquated actuarial assumptions to calculate participants' QJSAs, Defendants are causing participants to receive lower monthly payments than they should be receiving.

74.    While American Airlines used the unreasonable assumptions to calculate QJSAs, it uses reasonable, contemporary actuarial assumptions when calculating its pension liabilities in its audited financial statements.

75.    For example, Defendants calculated their pension liabilities for each Plan using the RP-2014, with adjustments and improvements specific to the Plan, for each year between 2014 and 2018.

76.    Beginning with the year ending December 31, 2019, Defendants began using the Pri-12 mortality table, again with modifications specific to each Plan, to calculate pension liabilities for each Plan.

77.    Throughout the relevant period, American Airlines used updated actuarial assumptions in the Plans' financial statements to report a greater liability for the benefits the Plans

expected to pay participants than the assumptions used to calculate QJSAs – the benefits actually paid to participants. There is no reasonable justification for Defendants to use the UP-84 to calculate the benefits actually paid to participants, while at the same time using up-to-date, reasonable actuarial assumptions in their annual financial reporting.

78.    Because these two analyses — determining Plan liabilities and determining Plan benefits actually paid to participants — measure the payment of the same benefit streams to the same people over the length of the same lives, they should be determined using current actuarial assumptions.

79.    Defendants also use current, reasonable mortality tables when calculating their funding obligations, but they use outdated, unreasonable mortality data when calculating QJSAs. As a result of the mismatch of mortality tables used for determining "equivalent" QJSA benefits and reasonable mortality tables, every participant who elected to receive a QJSA has been subsidizing the Plan during the Class Period.

80.    "ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit . . . 'If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of actuarial equivalence.'" *Laurent v. PriceWaterhouseCoopers LLP*, 794 F.3d 272 (2d Cir. 2015) *quoting*, *Esden v. Bank of Boston*, 229 F.3d 154, 164 (2d Cir. 2000).

81.    The Plans' formulas for determining QJSA benefits do ***not*** reflect "characteristics that are typical of the plan's participants." *McDaniel*, 203 F.3d at 1110. They cannot be used to calculate an annuity for the life of a participant. See, 29 U.S.C. § 1055(d). Instead, they can only be used to calculate an annuity for the "life" of someone who died decades ago.

19

82. If the Plans used reasonable actuarial assumptions — such as the Treasury Assumptions— Plaintiff and the Class would have received, and would continue to receive, actuarially equivalent benefits that are greater than the benefits they currently receive.

83. Discovery and expert analyses will likely show that Defendants' use of unreasonable factors to generate QJSA benefits deprived retirees and their spouses of millions of dollars.

84. Plaintiff Parisi started receiving benefits at age 62 and his wife was age 60. He selected a 50% JSA, which pays him $1,712.15 per month and was calculated using the UP-84 and a 5% discount rate. However, if his benefits were calculated using the Treasury Assumptions, his monthly benefit would increase to $1,807.16 — an increase of $95.01 per month or 5.5%. *Defendants reduced the present value of Mr. Parisi's pension benefits by approximately $21,310 through their use of unreasonable actuarial assumptions*.

85. Plaintiff has been harmed because his benefits were calculated using the UP-84. He is receiving less each month than he would have received if his Plan used reasonable, up-to-date actuarial assumptions, like ERISA requires. Plaintiff, along with each other class member, has been substantially damaged as a result of receiving benefits below an actuarially equivalent amount in violation of ERISA.

86. In short, Defendants failed to provide QJSAs that were actuarially equivalent to the SLA that participants were entitled to receive when they retired as required by ERISA § 205(d), 29 U.S.C. § 1055(d). By using a formula based on an unreasonable, antiquated actuarial assumption, Defendants have materially reduced the monthly benefits that participants and beneficiaries under the Plans receive in comparison to the monthly benefits they would receive if Defendants used factors based on updated, reasonable actuarial assumptions.

**CLASS ACTION ALLEGATIONS**

87.    Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil

Procedure on behalf of himself and the class (the "Class") defined as follows:

> All participants or beneficiaries of the Plans who began receiving pension benefits on or after October 1, 2018, in the form of a QJSA (i.e., 50-100% JSA) with a spouse as the beneficiary whose monthly pension benefit would be greater if calculated using the Applicable Mortality Table as defined in Internal Revenue Code § 417(e)(3)(B) in the year of the participant's Benefit Commencement Date and the Applicable Interest Rate as defined in Internal Revenue Code § 417(e)(3)(C) from the third month preceding the participant's Benefit Commencement Date.

> Excluded from the Class are (A) participants who retired after April 1 following the date he or she reached age 70 $^1/_2$ and (B) Defendants and any individuals who are subsequently determined to be fiduciaries of the Plans.

88.    The members of the Class are so numerous that joinder of all members is

impractical.  Upon information and belief, the Class includes thousands of persons; American

employs over 100,000 persons and the Plans in question cover transport workers, flight attendants

and managers.

89.    Plaintiffs' claims are typical of the claims of the members of the Class because

Plaintiffs' claims, and the claims of all Class members, arise out of the same policies and practices

as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful

conduct.

90.    There are questions of law and fact common to the Class and these questions

predominate over questions affecting only individual Class members.  Common legal and factual

questions include, but are not limited to:

> A.    Whether the Plan's assumptions provide QJSA benefits that are actuarially
>
>        equivalent to the SLA offered to participants;

21

B.    Whether the Plan's assumptions for calculating QJSA benefits are reasonable;

C.    Whether Plaintiff and Class members should have their benefits recalculated to conform with ERISA's actuarial equivalence requirements; and

D.    Whether Plaintiff and Class members should receive payments to compensate them for past and future benefit payments that did not and will not satisfy ERISA's actuarial equivalence requirements.

91.    Plaintiffs will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class actions.  Plaintiffs have no interests antagonistic to those of other members of the Class.  They are each committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

92.    This action may be properly certified under either subsection of Federal Rule of Civil Procedure 23(b)(1).  Class action status is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status also is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

93.    In the alternative, certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby

22

making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

94. If the Class is not certified under Rule 23(b)(1) or (b)(2), then certification under Rule 23(b)(3) is appropriate because the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**FIRST CLAIM FOR RELIEF**
**Declaratory and Equitable Relief**
**(ERISA §§ 205, 502(a)(3), 29 U.S.C. §§ 1055, 1132(a)(3))**

95. Plaintiff re-alleges and incorporate by reference all prior allegations in this Complaint.

96. Defendants have improperly reduced QJSA and QOSA benefits for participants and beneficiaries of the Plans below the amounts that they would have received if those benefits were actuarially equivalent to an SLA in violation of ERISA § 205, 29 U.S.C. § 1055.

97. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

98. Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiff seeks declaratory relief, determining that the methodologies used by Defendants for calculating the actuarial equivalence of QJSAs and QOSAs violate ERISA because they do not provide an actuarially equivalent benefit, as required by ERISA § 205(d), 29 U.S.C. § 1055(d).

99. Plaintiff seeks an order from the Court providing a full range of equitable relief, including but not limited to:

(a)  re-calculation, correction, and payment of QJSA benefits previously paid under the Plans;

(b)  an "accounting" of all prior benefits and payments;

(c)  an equitable surcharge;

(d)  disgorgement of amounts wrongfully withheld;

(e)  disgorgement of profits earned on amounts wrongfully withheld;

(f)  a constructive trust;

(g)  an equitable lien;

(h)  an injunction against further violations; and

(i)  other relief the Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### Breach of Fiduciary Duty
### (ERISA §§ 404 and 502(a)(3), 29 U.S.C. §§ 1104 and 1132(a)(3))

100. Plaintiff re-alleges and incorporate by reference all prior allegations in this Complaint.

101. American Airlines and the Committee are fiduciaries of the Plans.

102. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent that person "(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such

24

plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. As such, neither "named fiduciary" status, nor formal delegation is required for a finding of fiduciary status, and contractual agreements, such as the governing Plan documents, cannot override a finding of fiduciary status when the statutory test is met.

103.    The Committee and its members are fiduciaries for the Plans because throughout the Class Period they exercised discretionary authority or control respecting the management of the Plans, and/or exercised authority or control over the management or disposition of the Plans' assets, and/or have had discretionary authority or discretionary responsibility in the administration of the Plans.  Among other things, during the Class Period, the Committee had authority or control over the determination of the amount and payment of benefits from the Plans. Additionally, the Plans' Forms 5500 represented that "Committee was formed for the purpose of having responsibility for all fiduciary duties related to the administration and investment of the Plan[s]."

104.    American Airlines is a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it was the "Administrator" and "named fiduciary" of the Plans and because it exercised discretionary authority or control with respect to the management of the Plans, and/or exercised authority or control over management or disposition of the Plans' assets, and/or has discretionary authority or discretionary responsibility in the administration of the Plans, including, but not limited to, its duty to appoint and monitor members of the Committee.

105.    ERISA charges fiduciaries with among the highest duties known to law. These duties are set down in ERISA § 404, 29 U.S.C. § 1104, which states, in relevant part, the following:

25

(a) Prudent man standard of care

(1) . . . a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, *prudence*, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; . . . ; and

(D) in accordance with the documents and instruments governing the plan *insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III. . . .*

29 U.S.C. § 1104 (a)(emphasis added).

106.    As alleged above, under the terms of the Plans document, American Airlines and the Committee had the sole power, duty, and responsibility to direct the administration of the Plans in accordance with the requirements of the Tax Code and ERISA.

107.    The Plans use unreasonable formulas to calculate QJSAs that do not provide actuarially equivalent benefits in violation of ERISA's actuarial equivalence requirements. As a result, participants and beneficiaries do not receive the actuarially equivalent benefits ERISA require.

108.    Defendants breached their fiduciary duties by, among other reasons, directing the administration of the Plans in violation of ERISA.

109.    ERISA further imposes on fiduciaries that appoint other fiduciaries the duty to monitor the actions of those appointed fiduciaries to ensure compliance with ERISA. In allowing the Committee to pay benefits that were not actuarially equivalent, in violation of ERISA,

Defendant American Airlines breached its fiduciary duty to supervise and monitor the Committee and/or its delegatees.

110.   As a direct and proximate result of the Defendants' fiduciary breaches, participants in the Plans have lost, and are continuing to lose, millions of dollars in vested accrued pension benefits.

111.   American Airlines, the Committee, and its members, are jointly liable for the acts of the other as co-fiduciaries for the Plans.

112.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

113.   Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiff seek declaratory relief, determining that the Plans' established methodologies for calculating QJSAs do not provide actuarially equivalent benefits because they do not provide benefits with an equal present value to the SLA as required under ERISA.

114.   Plaintiff further seek orders from the Court providing a full range of equitable relief including but not limited to:

(a)   re-calculation, correction, and payment of actuarially equivalent QJSA benefits previously paid under the Plans;

(b)   an "accounting" of all prior benefits and payments;

(c)   an equitable surcharge;

(d)   disgorgement of amounts wrongfully withheld;

(e)   disgorgement of profits earned on amounts wrongfully withheld;

(f)     a constructive trust;

(g)     an equitable lien;

(h)     an injunction against further violations; and

(i)     other relief the Court deems just and proper.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.     Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Declare that the Plans have failed, and continue to fail, to properly calculate and pay QJSA benefits that are actuarially equivalent to the SLA, in violation of ERISA;

C.     Order Defendants to correct and recalculate QJSA benefits that have been paid under the Plans;

D.     Order Defendants to provide an "accounting" of all prior payments of QJSA and QOSA benefits under the Plans to determine the proper amounts that should have been paid;

E.     Order Defendants to pay all benefits improperly withheld, including under the theories of equitable surcharge and disgorgement;

F.     Order Defendants to disgorge any profits earned on amounts improperly withheld;

G.     Impose a constructive trust;

H.     Impose an equitable lien;

I.     Order Defendants to pay future benefits in accordance with ERISA's actuarial equivalence requirements;

J.      Award, declare, or otherwise provide Plaintiff and the Class with all relief available under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper;

K.      Award to Plaintiff's counsel attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

L.      Any other relief or remedy the Court determines is just and proper.


Dated:  October 1, 2024              Respectfully submitted,

**SIRI & GLIMSTAD LLP**

**SIRI & GLIMSTAD LLP**
/s/ *Kyle D. McLean* _____
Kyle D. McLean (Bar No. 6344126)
Oren Faircloth (*pro hac vice* forthcoming)
David J. DiSabato (*pro hac vice* forthcoming)
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: kmclean@sirillp.com
E: ofaircloth@sirillp.com
E: ddisabato@sirillp.com

**IZARD, KINDALL & RAABE LLP**
Robert A. Izard  (*pro hac vice* motion forthcoming)
Christopher M. Barrett (*pro hac vice* motion forthcoming)
29 South Main Street, Suite 305
West Hartford, CT 06107
(860) 493-6292
rizard@ikrlaw.com
cbarrett@ikrlaw.com

**MOTLEY RICE LLC**
Douglas P. Needham (*pro hac vice* motion forthcoming)
M. Zane Johnson (*pro hac vice* motion forthcoming)

29

One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
Telephone: 860-218-2720
dneedham@motleyrice.com

*Attorneys for Plaintiff*